# THEODORE C. LEONARD v. SOLOMON C. SHALE
## et al.

### Division One, December 2, 1915.

1. **CONVEYANCE: Wrongful Delivery: Unauthorized Opening of Letter.** The owner of land resided in Cincinnati, and his agent and brother resided in Missouri and was sick at the house of a friend and while there some kind of a trade was made for the land. The agent wrote the owner to make out a deed for the land, naming his host's son as grantee, inclose it in an envelope addressed to the agent, and inclose that envelope in another addressed to the agent's host. That was done, and when the letter was received by the host he opened both envelopes and immediately placed the deed of record without the knowledge or consent of either the agent or owner. *Held*, that the possession and record of the deed was wrongful, but that does not determine the rights of a subsequent innocent purchaser for value, even though the deed itself has been cancelled for non-delivery.

2. ————: ————: **Good Faith of Subsequent Purchaser.** A purchaser for a valuable consideration from the apparent record owner in possession of the land, with no knowledge that the deed to the apparent owner had been wrongfully obtained by him and placed of record without the owner's knowledge or consent, and with no such knowledge as would put him on inquiry, is not chargeable with bad faith. Nor does the fact that he had heard, before he made a loan on the land, that such apparent record owner had gotten a farm at a bargain, impugn his good faith in making the loan.

3. ————: ————: **Estoppel: Depositary: Violated Confidence: Innocent Third Parties.** No title passes to the grantee who wrongfully obtains or steals a fully executed deed and places it of record; but the grantor, as to subsequent grantees, may be estopped to dispute the validity of a conveyance by said grantee, by the conduct of the grantor in placing a fully executed deed in the hands of the father of such grantee, as his depositary, or by the conduct of the grantor after he knew such deed had been delivered and placed of record. So that where the owner's agent, residing at the residence of the grantee's father, wrote the owner to make out a fully executed deed, inclose it in an envelope addressed to the agent and inclose that in another envelope addressed to the father, and that was done, and when the letter came both envelopes were opened by the father and the deed immediately placed of record without the knowledge

or consent of the grantor or his agent, and the agent learned the facts soon after the deed was placed of record and the grantee and father went into possession and while in possession borrowed $1500 from defendant, who knew nothing of the fraudulent facts, and secured the loan by a deed of trust on the land, and the plaintiff (the óriginal grantor) knew for six months before defendant made the loan and obtained the deed of trust that the undelivered deed had been recorded, the plaintiff is estopped to dispute the validity of the deed of trust, because (1) he is chargeable with the knowledge of his agent who was in charge of the land at the time the deed was obtained, and (2) because he made the grantee's father the depositary of the deed and if he violated his confidence innocent third parties should not suffer, and (3) because he did not take prompt action, after he knew the deed had been recorded, to divest the grantee of his apparent record title.

4. ———: ———: ———: **Prompt Action.** The real owner of land cannot knowingly permit the title to stand upon the record in the name of another, and then defeat a mortgage placed thereon by such apparent owner, if the mortgagee acts in good faith and without knowledge of the true facts in taking the lien. A delay of six months by the grantor after he discovers that his fully executed deed had surreptitiously and wrongfully, without actual delivery, been placed of record, to bring proper proceedings to have the title divested out of the grantee, will estop him from enforcing his title as against a mortgagee who, without any knowledge of the fraud, in good faith in the meantime loans money to the apparent record owner.

Appeal from Buchanan Circuit Court.—*Hon. William D. Rusk*, Judge.

REVERSED (*with directions*).

*C. W. Meyer* for appellants.

(1) The aid of a court of equity can not be invoked when a party has slept on his rights and influenced others to act in the confident belief that he has relinquished his claims. Pomeroy's Equity Jurisprudence (2 Ed.), secs. 418, 419; Landrum v. Bank, 63 Mo. 48; Schradski v. Albright, 93 Mo. 48; Hughes v. McAlister, 15 Mo. 296. (2) Where a grantor has been guilty of negligence in having made, signed and acknowledged an instrument and in placing it where

the grantee might, if so disposed, readily obtain wrongful possession of it and so be enabled to deceive and defraud innocent third persons, he will be estopped from setting up his title as against a bonafide purchaser for value under such deed. Jones on Mortgages (3 Ed.), sec. 604; Martindale on Conveyancing (2 Ed.), p. 189; Tisher v. Beckwith, 30 Wis. 55; Gage v. Gage, 36 Mich. 229. (3) If the real owner of property allows it to stand recorded in the name of another by a title such as to pass the fee, he puts it in the power of that other to create a valid mortgage upon it. Snodgrass v. Emery, 66 Mo. App. 462; Lawrence v. Inv. Co., 51 Kan. 222; 27 Cyc. 1036; Hunter v. Buckner, 29 La. Ann. 604. (4) The deed of trust attacked by respondent in this case is good for the following reasons, in addition to the points urged above: (a) Where one is in possession of land and has a deed of record, the possession will be referred to his deed unless there are facts known to the purchaser indicating a different possessory right. Washburn on Real Property (4 Ed.), star p. 35. (b) A mortgagee of realty or the beneficiary in a deed of trust on realty is considered a purchaser thereof. Steadman v. Hayes, 80 Mo. 319; 27 Cyc. 1183. (c) A mortgagee will generally be justified in relying on an apparently legal title in his mortgagor, as shown by the records. 27 Cyc. 1036, 1183-5; State v. Mathews, 44 Kan. 596. (d) There is no evidence whatever that Shale, or anyone acting for him, knew of the claim of Leonard on the land when the deed of trust in suit was executed, and when the money was advanced on the strength of this security. (e) If a mortgage be made without consideration and is afterward negotiated, the price paid by the assignee becomes the consideration of the mortgage and makes it a valid security. Jones on Mortgages, sec. 788; Hosmer v. Campbell, 98 Ill. 572; Hanrion v. Hanrion, 84 Pac. 381; Verity v. Sternberger, 172 N. Y. 633. (f)

Where one of two innocent parties must suffer, he who placed it within the power of the third party to commit the fraud, or he whose conduct caused the damage, must bear the loss. 2 Herman on Estoppel, secs. 766, 767; 16 Cyc. 773.

*John S. Boyer* and *Vinton Pike* for respondent.

(1) The issue in this case is eminently one of fact. The question of appellant's good faith is all that the case involves. The case is this: Respondent owned this land and at request of his brother, Dr. Leonard, sent a deed with Reed Huff's name written in it as a grantee in an envelope addressed to A. B. Huff, Reed's father, inclosing another envelope sealed and containing the deed and addressed to Dr. Leonard. A. B. Huff, who had consented to receive the package for Dr. Leonard, opened both envelopes, and without the consent or knowledge of Dr. Leonard or respondent took the deed to the recorder's office and filed it for record. In a suit by respondent against Reed Huff, the deed was set aside and record cancelled because it had been obtained and recorded as above. (a) The deed never having been delivered, no title passed, and Shale acquired no right under the deed of trust unless respondent has estopped himself. Shale's position is that he is an innocent purchaser in good faith. The *onus* is on him. Stephenson v. Kilpatrick, 166 Mo. 268-9. (b) "There must be an intent to convey and the delivery of the deed for the purpose of vesting a present title in the grantee, and a deed deliverd without the consent of the grantor is of no more effect to pass title than if it were a forgery." Felix v. Patrick, 145 U. S. 329; Weddecombe v. Childers, 124 U. S. 405. "A deed which has been surreptitiously and fraudulently obtained from the grantor without his knowledge or consent does not, even as against a subsequent purchaser without notice, transfer his title." Devlin on Deeds, secs. 267, 322. "The deed 'in the eye' of

the law as it lay in escrow was a mere scroll. Its wrongful and untimely delivery by the custodian must not be allowed to be of any efficacy." Bales v. Roberts, 189 Mo. 69. (c) The deed was not delivered in fact or form to Reed Huff. A. B. Huff was the conduit through whom the paper was to pass to respondent's agent, Dr. Leonard. A. B. Huff was in no sense the agent of Reed Huff to accept it, nor of respondent to deliver it. He was a thief and nothing else. R. S. 1909, sec. 4542. (2) To maintain estoppel *in pais* fraud is essential "either in the intention of the party estopped, or in the effect of the evidence, which he attempts to put up." Bales v. Perry, 51 Mo. 453; Hequembourg v. Edwards, 155 Mo. 522; Hill v. Epley, 31 Pa. St. 334. And "it necessarily follows, that the party who claims the benefit of an estoppel, must not only have been free from fraud in the transaction, but must have acted with good faith and reasonable diligence, otherwise no equity will arise in his favor." 2 Pom. Eq. Jur., par. 813. (3) The court must defer much in this case to the action of the trial court. The appellant was charged with participating in Huff's fraud; and was before the court in person and testified in his own behalf. His evidence ought not to satisfy this court; and much weaker must it have seemed to the trial judge, where his manner was observed. Short v. Taylor, 137 Mo. 525. Besides this case is of the kind where the degree of proof must be clear and unequivocal and the circumstances free from suspicion. Hennessy v. Murdock, 137 N. Y. 317; Chambers v. McCreeny, 106 Fed. 367; Willett v. Fistler, 18 Wall. 91; Gardner v. Weston, 18 Iowa, 533; Moore v. Smith, 103 Mich. 387; Snyder v. Harris, 48 Atl. 331; Stafford v. Brown, 104 N. Y. S. 801; Conlon v. Mission, 79 N. Y. S. 406; Parker v. Parker, 63 Atl. 1094; Meier v. Blume, 80 Mo. 184; Hoppen v. Doty, 25 Wis. 591; Parker v. Foy, 43 Miss. 266; Eck v. Hatcher, 58 Mo. 241; Trester v. Pike, 62 N. W. 211. (4) Shale had the burden and

has not shown that he was innocent by clear and satisfactory proof. (a) He admits that there was a "little talk" around the Exchange about the Huffs and Leonard and this land and he caught "up more or less of it." The talk must have been about stealing the deed, which Shale calls getting the land "at a bargain." It gave the Huffs a bad name about the Exchange, because they got and recorded the deed surreptitiously, not that they had overreached Leonard in a deal. Shale says the Huffs and Leonard were well known there. There would be no occasion for "talk," but for the way the deed was obtained. A. B. Huff obtained the deed and Reed Huff was discharged from the post office and both were leaving the place. The talk could not have been that their good luck was taking them away, when their notoriously bad repute was driving them away. (b) A. B. Huff says Shale and Reed Huff were acquainted while Shale says he only knew him by sight. If he was trying to help the Huffs cover this land he would wish his attitude toward them to appear to be that of a stranger; and his denial of an acquaintance with them ought to be construed as an admission from his standpoint that acquaintance with them spelled conspiracy to defraud Leonard. The court evidently believed they were acquainted as A. B. Huff states, and that Shale's denial was untrue, and made to evade the effect of intimacy with them. *Machinatur ad circumveniendum.* (c) Shale always has been friendly with the Huffs. He did not call Reed Huff as a witness, because his testimony would not be favorable to his cause, either as directly impeaching Shale or indirectly injuring it in the ordeal of cross-examination. In any view the inference is adverse. Ellis v. Gulf, 54 Fed. 481; Kirby v. Talmadge, 160 U. S. 383. Reed Huff lived at Garnett, Kansas, and A. B. Huff at Olathe. The one was as accessible as the other, and failure to produce Reed "creates the presumption that the

testimony, if produced, would be unfavorable."
Graves v. United States, 150 U. S. 121. Shale says
he advised with his attorney and they "thought it
would be a good idea to have his (A. B.'s) evidence.
He was the party we made the loan to, and he knew
the matter." The only matter about which his evi-
dence could be desired was the fraud on Leonard.
A. B. Huff says he negotiated the trade for the land,
but did not tell what the trade was; and agrees "the
land was never paid for" and that the deed was set
aside—as he would state it—not as fraudulent, but
"the decision was not clear." (d) Shale says he never
talked with the Huffs before or after the pretended
loan. When they defaulted, he made no effort to col-
lect from Huff; never asked him to pay. Says
he was never asked to prosecute Huff, but his attorney
contradicts him as to that. When asked pointedly if
he was not depending on collecting the money by
means of the Leonard land and did not expect to col-
lect of Huff, he answered, "Well, I don't know about
that," and that he would have tried to collect the
interest "if this had not been decided against us,"
and when Huff lost his case, he "knew then he would
not pay." By the "us" he unconsciously associated
himself intimately with the Huffs. His mind was
hinged upon the original purpose to extract the money
from the land and not from the Huffs. Throughout
Shale acted like a man who had incurred no loss. (e)
In a deposition Shale had stated that if he had known
Huff was to pay only $2000 for the land he would not
have loaned $1500 on it. He felt that admission made
against him, and on the trial said he thought Huff was
getting the land "for a bargain." How did he learn
this? "Well, sir, I could not say more than you would
hear people talk, and they would say they got it cheap,
or something like that." Did he hear Huff was trying
to steal it from Leonard? "Well, no; I can not say

266Mo.9

that I did." If an honest man in Shale's situation were asked the question would he have hesitated in his answer, and left the implication that he may have heard it? Nunn v. Brandon, 24 Ont. 375. (f) The reputation of the Huffs was generally bad about the Exchange and was talked about in connection with their dealing with Leonard. This was what Shale heard, and he is presumed to have known all an inquiry about it would have led to. Jones v. Smith, 1 Hare, 55; Willis v. Valette, 61 Ky. 186. Shale says the story about the Exchange was something that "will cause a little talk around and you will catch up more or less of it." It was such as people "take interest in and discuss." The occasion of talk in fact was the theft of the deed. Shale shuffled, evaded and must have heard more than he would admit. (g) It was intimated that the money borrowed was used in improving the Leonard farms, "used it mostly on the places there." If the money was wanted for a purpose and was not used for that purpose, it was some evidence no money was supplied, and what they did on both places did not exceed in value $75. If Reed were a witness he could not have accounted for any money of Shale. (h) The record does not show when Leonard v. Huff was begun—whether before or after the Wilson-Shale mortgage—nor does it appear that said suit was not promptly instituted and prosecuted. Laches must be pleaded and there is nothing here tending to show that the plaintiff did not diligently pursue his remedy. Plaintiff did not put Huff in a position where he could commit a fraud upon another. Huff got into that position by a criminal act and the rule appealed to by appellant does not apply. 16 Cyc. 773. See especially: Walsh v. Hunt, 120 Cal. 46; Bank v. Clark, 51 Iowa, 264; Holmes v. Trumper, 22 Mich. 432. (i) There is no evidence to justify the belief that any money passed permanently from Shale to Huff. Shale did not trace any money to Huff, but

significantly omitted to do so. He said he had in court checks which he would put in evidence but did not. The indorsements thereon might have led to a demonstration that the funds did not pass from him except as a pretense.

GRAVES, P. J.—Action to ascertain and determine title. Judgment below was for the plaintiff, and defendant has appealed. The facts relied upon by plaintiff are concisely stated in the petition thus:

"That the defendants claim to have some title, estate or interest in said lands; that the plaintiff is informed, believes and charges that the defendants' claim aforesaid is based upon a certain deed of trust made by Reid H. Huff to the defendant, Charles W. Meyer, as trustee, to secure the payment of a note of said Huff to one William H. Wilson of the Philippine Islands in the amount of fifteen hundred dollars, payable three years after date, with interest at five per cent, which said deed of trust bears date November 3, 1909, was acknowledged before competent authority on said date and recorded on the same date in the recorder's office of Buchanan county, in book 391, at pages 66 and 67; that the said Reid H. Huff, who made said deed, had no title, estate or interest in said lands, but had fraudulently, wickedly and surreptitiously obtained the semblance thereof by purloining from the custody of plaintiff's agent, a deed which the plaintiff had made, signed and acknowledged and entrusted to said agent for delivery to said Reid H. Huff, in the event that said Reid H. Huff should make a contemplated purchase of said lands; that said Huff did not purchase said lands or any part thereof or interest therein, and said deed has been, in a certain action brought by plaintiff against said Huff, declared to be null and void, by reason of its non-delivery to him, and the record thereof has been set aside and can-

celled; that said action and the decree therein was lately had and made in this court, in which action this plaintiff was the plaintiff, and the said Reid H. Huff was defendant, and wherein the said Reid H. Huff was duly served with process and appeared in said action.

"That the said note made by Reid H. Huff to said Wilson, and pretended to be secured by said deed of trust to the defendant Meyer, was not made and delivered upon any consideration whatever from said Wilson, but the name of said Wilson was used as a cover for a transaction between said Reid H. Huff and the defendant Shale, and that while said note was made to said Wilson, it was intended for said Shale, and was by Wilson in form assigned and transferred to said Shale, who is now the owner and holder thereof."

The answer admits that Shale is the owner and holder of the deed of trust and note mentioned in the answer, and avers that the same was duly and properly executed. The answer also sets up the plea that Shale was a purchaser for value of said note, and without notice of any alleged defects in the proceedings. In terse terms, that he, Shale, was an innocent purchaser, for value. There was also in the answer facts pleaded tending to show an estoppel.

The pertinent facts are such as can be stated shortly. Plaintiff was not a resident of Missouri, but had a brother who lived in St. Joseph. Plaintiff resided at Cincinnati, Ohio. He owned this land in Buchanan County, which was under the immediate control of his brother, Dr. Leonard. In January, 1909, Dr. Leonard was sick at the residence of A. B. Huff in South St. Joseph. A. B. Huff was the father of Reid Huff, who figures conspicuously in this case. During the time Dr. Leonard was at the residence of A. B. Huff some kind of a trade for this land and other

lands belonging to Leonard's sisters was made. Dr. Leonard wrote the plaintiff to make out a deed to the forty acres of land in question and inclose it in an envelope addressed on the outside to him (Dr. J. W. Leonard), and to inclose this in another envelope and address it to A. B. Huff, South St. Joseph, Mo., and mail it to A. B. Huff in that way. This was done. When Huff received the letter thus addressed, he evidently opened the letter to Dr. Leonard and took out the deed, and it was immediately placed of record without the knowledge or consent of either Dr. Leonard or the plaintiff. This deed conveyed the land to Reid H. Huff, and the Huffs took possession of the land. The deed was acknowledged in Ohio January 27, 1909, and recorded in St. Joseph January 29, 1909, or just two days later. In October, 1909, Reid H. Huff began to negotiate a loan on this land. The first arrangement was to get a loan of $1500 from William H. Wilson, then in the Philippine Islands, through his brother, Sidney C. Wilson, an attorney at St. Joseph and an agent of William H. Wilson. This was to be a five per cent loan. Papers were accordingly drawn up, but Sidney C. Wilson found that he could get a better rate of interest for his brother, and the defendant Shale was induced to take the loan on this land. Accordingly the note was assigned to Shale and he put up the $1500, which was received by Reid H. Huff, less the expenses of making the loan. There is no question of Shale being out $1500. The plaintiff learned in April, 1909, that this deed had been placed of record, and Dr. Leonard, his agent, knew that it had been placed of record, about the date of its record. Shale says he had no knowledge of any trouble about the title until Leonard sued Reid H. Huff to cancel the deed. This was early in 1910. His suit was successful, and shortly thereafter the present suit was brought. Details will be left to the opinion. This outlines the case.

I.   Upon this record it is quite clear that the possession and record of the deed from plaintiff to Reid H. Huff was wrongful.   It appears to have

**Deed: Wrongful Delivery.**

been so held in a suit for its cancellation, in which judgment cancelling it was entered. We start this case with that concession.   A. B. Huff should have delivered plaintiff's deed to Dr. J. W. Leonard, and not to Reid H. Huff, as was evidently done.   But this concession does not of itself justify the judgment *nisi* in the instant case.

II.   The real questions in this case are (1) the good faith of Shale, and (2) the question of estoppel urged as against the plaintiff.   We have

**Good Faith of Subsequent Purchaser.**

read this record thoroughly and there is no substantial evidence against the good faith of Shale.   Nor is there substantial evidence ·tending to show that he had any knowledge of what happened between the Leonards and the Huffs.   The fact that he had heard discussed at times that the Huffs had gotten a farm at a bargain, is not such as would impugn his good faith in making this loan.   Nor is there any thing in this record that would cast upon Shale the duty to make inquiry.   The record title was in Reid H. Huff.   The Huffs were in possession, and nothing on the surface to call for an inquiry by Shale. We therefore dismiss this branch of the case by saying that there is nothing in the record which would impugn the good faith of Shale in the transaction, and that in good faith he parted with $1500 on the apparent title of Reid H. Huff to this land.

III.   Conceding then that the possession of the deed from Leonard to Huff was wrongful, and that the recording thereof occurred by reason of the wrongful possession, how stands the case?

It is undisputed that the Huffs went into possession

Leonard v. Shale.

and remained in possession for a year. They were in

<span style="margin-left:2em">Estoppel.</span> possession when the deed of trust was made. It is undisputed that the plaintiff's agent in charge of this land knew this fact. It is undisputed that plaintiff's agent, in charge of this land for him, knew of the record of this deed, at or about the time it was placed of record, and plaintiff admits that he knew of it six months before the defendant Shale bought the $1500 note and deed of trust. With these patent and undisputed facts, should the plaintiff be protected by a decree such as was entered *nisi?* We think not. Respondent's very able counsel, in the brief say:

"The deed never having been delivered, no title passed, and Shale acquired no right under the deed of trust unless respondent *has estopped himself.* Shale's position is that he is an innocent purchaser in good faith. The onus is on him."

We think counsel have well expressed the law of the case. Defendant's evidence clearly shows good faith, and its force and effect is not impaired to any serious extent by a close and vigorous cross-examination, upon which the plaintiff relies. That Shale was in good faith when he took this note and deed of trust, we have no doubt under the record before us. That there were no circumstances which called for a special inquiry as to title by Shale is equally clear. No facts appear which would lead a reasonably prudent man to suspect that the record title was not the true title, and therefore there was no legal demand upon Shale to look further, or inquire further as to the title. The onus of showing good faith has been borne by the defendant Shale. The above leaves only the question of estoppel. This can be approached from two angles: (1) the conduct of the plaintiff in placing a fully executed deed in the hands of the father of Reid H. Huff and (2) the conduct of the plaintiff after he knew that such deed had in fact been delivered and placed of

record. For this case we may assume, as contended by plaintiff, that a deed stolen from a grantor, before delivery, passes no title to the grantee therein named, nor to one acquiring a deed from him, but there are exceptions to such a rule. Thus the Wisconsin court speaks in Tisher v. Beckwith, 30 Wis. l. c. 58:

"The only question which can ever arise to defeat the title of the supposed grantor in such cases, is whether he was guilty of any negligence in having made, signed and acknowledged the instrument, and in suffering it to be kept or deposited in some place where he knew the party named as grantee, might if so disposed, readily and without trouble obtain such wrongful possession of it and so be enabled to deceive and defraud innocent third persons. It might possibly be that a case of that kind could be presented where the negligence of the supposed grantor in this respect was so great, and his inattention and carelessness to the rights of others so marked, that the law would on that account estop him from setting up his title as against a bona-fide purchaser for value under such deed. [See Everts v. Agnes, 6 Wis. 453.] . . . .

"The same case (Burson v. Huntington, 21 Mich. 415) also makes a distinction between a note or other instrument so obtained and one deposited in escrow and afterwards fraudulently delivered by the depositors, holding that in the latter case the maker would be bound as against an innocent holder for value, on the ground of the trust or confidence reposed by him in the depositary, and upon the principle that, when one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it. Upon the same question also of negligence, see Wait v. Pomeroy, 20 Mich. 425, 4 Am. R. 395."

Both these doctrines apply to this case. The agent of plaintiff knew the relationship between A. B. Huff and Reid H. Huff (that of father and son and member

of the same household) when he directed the deed to be mailed to said Huff. This knowledge should be attributed to plaintiff, because his agent was the party in charge of the land (and its sale) which was the subject of the trade and deed. Then in addition to that the plaintiff made the elder Huff his depositary, and if he violated his confidence, innocent third parties should not suffer. Upon the ground of negligence, as well as the latter ground, the plaintiff should be estopped to assert his title as against Shale.

IV. Not only should the plaintiff be estopped by reason of his own negligence in placing an acknowledged deed in a place where its delivery might be obtained wrongfully, and by reason of the further fact that A. B. Huff was the depositary of his own selection, and thereby his agent, but his conduct after the delivery and record of the deed should bar his action by way of estoppel. In 27 Cyc. 1036 the rule is thus stated:

"If the real owner of property allows it to stand recorded in the name of another, by a title such as to pass the fee, he puts it in the power of that other to create a valid mortgage upon it. And the lien of a mortgage will prevail against the right of any third person to impeach and divest the mortgagor's title as having been obtained by fraud or false representations, where the mortgagee relied on the clear record title of his mortgagor and had no notice actual or constructive of the rights of the stranger."

Plaintiff knew that his deed was of record long before this deed of trust was taken by defendant Shale. He knew that the Huffs had gone into possession. The deed conveyed the fee to Reid H. Huff. Plaintiff should have taken prompt action toward divesting Huff of his apparent title. Such action would have saved the defendant Shale. One can not knowingly permit the title to his lands to stand in the name of another, and then defeat liens placed thereon by such person, if the

party who takes the lien, acts in good faith and without knowledge of the true facts. We have no hesitancy in holding that the conduct of plaintiff after he discovered that his deed had been delivered and placed of record, is such as to estop him from enforcing his title as against Shale. Where one of two innocent parties must suffer the one which has by his acts placed or left it within the power of a wrongdoer to do the wrong, must be the loser, under well established doctrines of equity. Plaintiff falls within this rule. A court of conscience can not permit Shale to lose his lien under the admitted facts of this case.

The judgment *nisi* is for the wrong party, and such judgment is reversed, with directions to enter up a judgment which will in all respects fully protect the deed of trust and interests of Shale. It is so ordered. All concur.